**EXHIBIT** 2



# California Business Portal

## Secretary of State DEBRA BOWEN

**DISCLAIMER:** The information displayed here is current as of Nov 2, 2007 and is updated weekly. It is not a complete or certified record of the Limited Partnership or Limited Liability Company.

| LP/LLC | | |
|---|---|---|
| DAIMLERCHRYSLER MOTORS COMPANY LLC | | |
| **Number:** 200133410039 | **Date Filed:** 11/29/2001 | **Status:** active |
| **Jurisdiction:** DELAWARE | | |
| **Address** | | |
| 1000 CHRYSLER DR CIMS 485-12-30 | | |
| AUBURN HILLS, MI 48326-2766 | | |
| **Agent for Service of Process** | | |
| C T CORPORATION SYSTEM (C0168406) | | |

Blank fields indicate the information is not contained in the computer file.

If the agent for service of process is a corporation, the address of the agent may be requested by ordering a status report. Fees and instructions for ordering a status report are included on the Business Entities Records Order Form.

EXHIBIT ___3___

# Chrysler

From Wikipedia, the free encyclopedia

**Chrysler LLC** is an American automobile manufacturer that has been producing automobiles since 1925 and from 1914 under the Dodge name. From 1998 to 2007, Chrysler and its subsidiaries were part of the German based DaimlerChrysler (now Daimler AG) after an arduous deal dubbed a "Merger of Equals" in 1998.[1] Prior to 1998, Chrysler Corporation traded under the "C" symbol on the NYSE. Under DaimlerChrysler, the company was named "DaimlerChrysler Motors Company LLC", with its U.S. operations generally referred to as the "Chrysler Group".

On May 14, 2007 DaimlerChrysler AG announced the sale of 80.1% of Chrysler Group to American equity firm Cerberus Capital Management, L.P., although Daimler continues to hold a 19.9% stake. **Chrysler LLC** is the new name.[2] The deal was finalized on August 3, 2007.[3]

After the announcement of the spin-off to Cerberus, the Chrysler LLC, or "The New Chrysler", unveiled a new company logo on August 6, 2007 and launched its new website with a variation of the previously used Pentastar logo. Robert Nardelli also became Chairman and CEO of Chrysler under the ownership of Cerberus. Chrysler is now the only private automaker in North America.

| Chrysler LLC | |
|---|---|
|  | |
| Type | Private |
| Founded | June 6, 1925 |
| Headquarters | ▦ Auburn Hills, Michigan, USA |
| Area served | International |
| Key people | Robert Nardelli, Chairman & CEO<br>Thomas W. LaSorda, Vice-Chairman & President<br>Jim Press, Vice-Chairman & President |
| Industry | Automotive |
| Products | automobiles, light trucks and vans |
| Revenue | ▬US$59.4 Billion (2006) |
| Net income | ▬ US$2.91 Billion (2006) |
| Employees | 132,130 (2006) |
| Parent | Cerberus Capital Management (80.1%)<br>Daimler AG (19.9%) |
| Divisions | Chrysler, Dodge, ENVI, Jeep, Mopar, Chrysler Financial |
| Subsidiaries | Chrysler Canada, Chrysler Australia |
| Website | chryslerllc.com (http://www.chryslerllc.com) |

# Contents

- 1 History
    - 1.1 Founding and early years
    - 1.2 Vehicle Marques
    - 1.3 Other Marques
    - 1.4 Airflow
    - 1.5 1960s
    - 1.6 Expansion into Europe
    - 1.7 Government loan guarantees

- ■ 1.8 Acquisition by Daimler-Benz
- ■ 1.9 Sale
- ■ 2 Logos
  - ■ 2.1 Medallion logo
  - ■ 2.2 Forward Look
  - ■ 2.3 Pentastar
  - ■ 2.4 Winged logo
- ■ 3 Alternative propulsion
  - ■ 3.1 Hybrid vehicles
- ■ 4 See also
  - ■ 4.1 Countries
- ■ 5 References
- ■ 6 External links
  - ■ 6.1 In the media

# History

### Founding and early years

The company was founded by Walter P. Chrysler on June 6, 1925, when the Maxwell Motor Company was re-organized into the Chrysler Corporation.[4]



1936 Chrysler Airflow Series C-9

Walter Chrysler had originally arrived at the ailing Maxwell-Chalmers company in the early 1920s, having been hired to take over and overhaul the company's troubled operations (just after having done a similar rescue job at the Willys car company).

In late 1923 production of the Chalmers automobile was ended.

Then in January of 1924 Walter Chrysler launched the well-received Chrysler automobile. The Chrysler was a 6-cylinder automobile, designed to provide customers with an advanced, well-engineered car, but at a more affordable price than they might expect. (Elements of this car are traceable back to a prototype which had been under development at Willys at the time that Walter Chrysler was there).

The Maxwell was then dropped after its 1925 model year run, although in truth the new line of lower-priced 4-cylinder Chryslers which were then introduced for 1926 were basically Maxwells which had been re-engineered and rebranded.

It was during this period that Walter Chrysler assumed the presidency of the company, with the company then ultimately incorporated under the Chrysler name.

### Vehicle Marques

In 1928, Chrysler Corporation began dividing their vehicle offerings by price class and function. The **Plymouth** brand was introduced and aimed at the low-priced end of the market by reëngineering and rebadging Chrysler's 4-cylinder models. At the same time, the **DeSoto** marque was introduced in the medium-price field. Shortly thereafter, Chrysler bought the Dodge Brothers automobile and truck company and launched the Fargo range of trucks. By the late 1930s, the DeSoto and Dodge divisions would trade places in the corporate hierarchy. This proliferation of marques under Chrysler's umbrella might have been inspired by the similar strategy employed



1931 Plymouth

successfully by General Motors. Beginning in 1955, Imperial, formerly the top model of the Chrysler brand, became a marque of its own, and in 1960, the Valiant was introduced likewise as a distinct marque. In the US market, Valiant was made a model in the Plymouth line and the DeSoto name was withdrawn for 1961. With those exceptions per applicable year and market, Chrysler's range from lowest to highest price from the 1940s through the 1970s was Valiant, Plymouth, Dodge, DeSoto, Chrysler, and Imperial. After acquiring AMC in 1987, Chrysler fulfilled one of AMC's conditions of sale by creating the Eagle marque to be sold at existing AMC-Jeep dealers.

By 2001 and as of 2007, the company has three marques worldwide: Dodge, Jeep and Chrysler.

## Other Marques



MoPar oil filter, 1956-1962 design

In the 1930s, the company created a formal vehicle parts division under the **MoPar** brand (a portmanteau of **Mo**tor **Par**ts), with the result that "Mopar" remains a colloquial term for vehicles produced by Chrysler Corporation. The MoPar (later **Mopar**) brand was not used in Canada, where parts were sold under the **Chryco** and **AutoPar** brands, until the Mopar brand was phased into the Canadian market beginning in the late 1970s.



Airtemp logo on window of air conditioned Chrysler Corp. vehicle

The company also launched the **Airtemp** marque for stationary and mobile HVAC. The first AirTemp installation was in 1930's Chrysler Building[5].

### Airflow

In 1934 the company introduced the Airflow models, featuring an advanced streamlined body, among the first to be designed using aerodynamic principles. Chrysler created the industry's first wind tunnel to develop them. Buyers rejected its styling, and the more conventionally-designed Dodge and Plymouth cars pulled the firm through the Depression years. Plymouth was one of only a few marques that actually increased sales during the cash-strapped thirties.

The unsuccessful Airflow had a chilling effect on Chrysler styling and marketing, which remained determinedly conservative through the 1940s and into the 1950s, with the single exception of the installation of hidden headlights on the very brief production run of 1942 DeSotos. Engineering advances continued, and in 1951 the firm introduced the first of a long and famous series of Hemi V8s. In 1955

things brightened with the introduction of Virgil Exner's successful Forward Look designs. With the inauguration of the second generation Forward Look cars for 1957, **Torsion-Aire** suspension was introduced. This was not air suspension, but an indirect-acting, torsion-spring front suspension system which drastically reduced unsprung weight and shifted the car's center of gravity downward and rearward. This resulted in both a smoother ride and significantly improved handling. A rush to production of the 1957 models led to quality control problems including poor body fit and finish, resulting in significant and early rusting. This, coupled with a national recession, found the company again in recovery mode.

## 1960s

Starting in the 1960 model year, Chrysler built all their passenger cars with Unibody™ (unit-body or monocoque) construction, except the Imperials which retained body-on-frame construction until 1967. Chrysler thus became the only one of the Big Three American automakers (General Motors Corporation, Ford Motor Company, and Chrysler) to offer unibody construction on the vast majority of their product lines. This construction technique, now the worldwide standard, offers advantages in vehicle rigidity, handling, and crash safety, while reducing squeak and rattle development as the vehicle ages. Chrysler's new compact line, the Valiant, opened strong and continued to gain market share for over a decade. Valiant was introduced as a marque of its own, but the Valiant line was placed under the Plymouth marque for US-market sales in 1961. The 1960 Valiant was the first production automobile with an Alternator rather than a electrical generator as standard equipment. It proved such an improvement that it was used in all Chrysler products in 1961. The DeSoto marque was withdrawn from the market after the introduction of the 1961 models due in part to the broad array of the Dodge lines and the general neglect of the division. The same affliction plagued Plymouth as it also suffered when Dodge crept into Plymouth's price range. This would eventually lead to the demise of Plymouth several decades later. An ill-advised downsizing of the full-size Dodge and Plymouth lines in 1962 hurt sales and profitability for several years.

In April 1964, the Plymouth Barracuda, which was a Valiant sub-model, was introduced. The huge glass rear window and sloping roof were polarizing styling features. Barracuda was released almost two weeks before Ford's Mustang, and so the Barracuda was chronologically the first pony car. Unlike the Mustang, Barracuda did not rob sales of other division's models. In spite of Barracuda's generally acknowledged better build quality, handling, braking and performance than the Mustang, the Mustang still outsold the Barracuda 10-to-1 between April 1964 and August 1965.



Plymouth Barracuda

## Expansion into Europe

In the 1960s Chrysler expanded into Europe, attaining a majority interest in the British Rootes Group in 1964, Simca of France and Barreiros of Spain, to form Chrysler Europe. For the Rootes Group one outcome of this take over was the launch of the Hillman Avenger in 1970 (briefly sold in the US as the Plymouth Cricket), which sold in Britain alongside the rear-engined Imp and the Hunter. Due to the industrial unrest rife in Britain during the 1970s the former Rootes Group got into severe financial difficulties. The Simca and Barreiros divisions were more successful, but in the end the various problems were overwhelming and the firm gained little from these ventures. Chrysler sold these assets to PSA Peugeot Citroën in 1978, which in turn sold the British and Spanish truck production lines to Renault of France .

Case 3:07-cv-03258-SC    Document 22-2    Filed 11/09/2007    Page 8 of 30

More successfully, at this same time the company helped create the muscle car market in the U.S., first by producing a street version of its Hemi racing engine and then by introducing a legendary string of affordable but high-performance vehicles such as the Plymouth GTX, Plymouth Road Runner, and Dodge Charger. The racing success of several of these models on the NASCAR circuit burnished the company's engineering reputation.

The 1970s brought both success and crisis. The aging but stalwart compacts saw a rush of sales as demand for smaller cars crested after the first gas crisis of 1973. An large investment in an all-new full-size lineup went largely to waste as the new 1974 vehicles appeared almost precisely as gasoline prices reached a peak and large car sales collapsed. 1974 would also mark the end of the Barracuda (and the similar Dodge Challenger) after the redesigned ponycars introduced for 1970 had failed to attract buyers in the shrinking market segment. At mid-decade, the company scored a conspicuous success with its first entry in the personal luxury car market, the Chrysler Cordoba. The introduction of the Dodge Aspen/Plymouth Volare twins in 1976 did not repeat the success of the discontinued Valiant/Dodge Dart line, and the company had delayed in producing a domestic entry in the now-important subcompact market. Chrysler Europe essentially collapsed in 1977, and was offloaded to Peugeot the following year, ironically just after having helped design the new Plymouth Horizon and Dodge Omni, on which the desperate company was pinning its hopes. Shortly thereafter, Chrysler Australia, which was now producing a rebadged Japanese Mitsubishi Galant, was sold to Mitsubishi Motors. The subcompact Horizon was reaching the US market as the second gas crisis struck, devastating sales of Chrysler's larger cars and trucks, and the company had no strong compact line to fall back on. Later the Horizon was produced and developed in Finland and marketed in Scandinavia as Talbot Horizon. After the Peugeot bought Talbot and the new version of Horizon was named as Peugeot 309.

## Government loan guarantees

The Chrysler Corporation on September 7, 1979 petitioned the United States government for US$1.5 billion in loan guarantees to avoid bankruptcy. At the same time former Ford executive Lee Iacocca was brought in as CEO. He proved to be a capable public spokesman, appearing in advertisements to advise customers that "If you find a better car, buy it." He would also provide a rallying point for Japan-bashing and instilling pride in American products. His book *Talking Straight* was a fitting reply to Akio Morita's *Made in Japan*. Congress reluctantly passed the "Chrysler Corporation Loan Guarantee Act of 1979" (Public Law 96-185) on December 20,



A Dodge Aries. The "K-cars" are generally credited with saving Chrysler from bankruptcy.

1979 (signed into law by President Jimmy Carter on January 7, 1980), prodded by Chrysler workers and dealers in every congressional district who feared the loss of their livelihoods. The military then bought thousands of Dodge pickup trucks which entered military service as the CUCV. With such help and a few innovative cars (such as the K-car platform), especially the invention of the minivan concept, Chrysler avoided bankruptcy and slowly recovered.

In February 1982 Chrysler announced the sale of Chrysler Defense Inc., its profitable defense subsidiary to General Dynamics for $348.5 million. The sale was completed in March 1982 for the revised figure of $336.1 million.[6]

By the early 1980s, the loans were being repaid at a brisk pace and new models based on the K-car

platform were selling well. A joint venture with Mitsubishi called Diamond Star Motors strengthened the company's hand in the small car market. Chrysler acquired AMC in 1987, primarily for its Jeep brand, although the failing Eagle Premier would be the basis for the Chrysler LH platform sedans. This bolstered the firm, although Chrysler was still the weakest of the Big Three. In the early 1990s, Chrysler made its first steps back into Europe, setting up car production in Austria, and beginning right hand drive manufacture of certain Jeep models in a 1993 return to the UK market. The continuing popularity of Jeep, bold new models for the domestic market such as the Dodge Ram pickup, Dodge Viper (badged as "Chrysler Viper" in Europe) sports car, and Plymouth Prowler hot rod, and new "cab forward" front-wheel drive sedans put the company in a strong position as the decade waned.

## Acquisition by Daimler-Benz

In 1998 Daimler-Benz purchased Chrysler, forming DaimlerChrysler AG. Chrysler Corporation then was legally renamed DaimlerChrysler Motors Company LLC, while its total operations began doing business as Chrysler Group. This was initially declared to be a *merger of equals*,[7] but it quickly became evident that Daimler-Benz was the dominant partner. Chrysler went into another of its financial tailspins soon after the merger, greatly depressing the stock price of the merged firm and causing alarm at headquarters in Germany, which sent


Dodge Intrepid.

CEO Dieter Zetsche to take charge. The Plymouth brand was phased out in 2001, and plans for cost cutting by sharing of platforms and components began. The strongly Mercedes-influenced Chrysler Crossfire was one of the first results of this program. A return to rear-wheel drive was announced, and in 2004 a new Chrysler 300 using this technology and a new Hemi V8 appeared and was successful. Financial performance began to improve, with Chrysler providing a significant share of DaimlerChrysler profits due to restructuring efforts at the Mercedes Car Group. The partnership with Mitsubishi was dissolved as DaimlerChrysler divested its stake in the firm due to diving Mitsubishi profits and sales worldwide.

## Sale

According to the April 2007 issue of Der Spiegel, CEO Dieter Zetsche expressed a desire to dismantle Chrysler and sell off the majority stake and at the same time keep Chrysler "dependent" upon Mercedes-Benz after the sale.[8]


Chrysler Sebring.

On April 4, 2007 Dieter Zetsche said that the company was negotiating the sale of Chrysler, which was rumored for weeks before the announcement. One day after, investor Kirk Kerkorian placed a 4.5 billion dollar bid for Chrysler. On 12 April Magna International of Canada announced it was searching for partners to place a bid for Chrysler. Magna's offer was outbid.

On May 14, 2007 DaimlerChrysler AG announced that it would sell 80.1% of its stake in the Chrysler Group to Cerberus Capital Management for $7.4 Billion. After the transaction was to complete, Chrysler Group (DaimlerChrysler Corporation) would officially become **Chrysler Holding LLC** (changed to **Chrysler LLC** upon completion of the sale), with two subsidiaries - **Chrysler Motors LLC** (new name of **DaimlerChrysler Motors Company**), which will produce Chrysler/Dodge/Jeep vehicles, and **Chrysler**

**Financial Services LLC** (new name of **DaimlerChrysler Financial Services Americas LLC**), which will take over the current operations of Chrysler Financial. DaimlerChrysler AG plans to change its name to Daimler AG pending shareholder approval sometime this fall.[9] On August 7th, 2007 Chrysler named Robert L. Nardelli Chief Executive.[10] On August 28, 2007, Chrysler hired Deborah Meyer, former Vice-President of Marketing at Lexus, to become Vice-President and Chief Marketing Officer for their marketing team.[11] On September 6th, 2007 Chrysler named James Press, formerly Toyota's highest ranking American executive, as their co-president.[12] A day later, Chrysler named Phil Murtaugh, formerly the Vice-President of Shanghai Automotive Industry Corporation, as CEO of their Asian Operations.[13]

On October 10, 2007 the new company experienced its first labor dispute. A strike deadline of 11 a.m. had been set by the United Auto Workers (UAW) union leadership pending successful negotiation of a new contract patterned after the pact with GM. As the talks progressed past the deadline, most Chrysler unionized workers walked off their jobs. With media speculation about the impact of a long strike, an impromptu announcement after 5 p.m. the same day indicated that a tentative agreement had been reached, thus ending the walkout after just over six hours.[14]

# Logos

## Medallion logo

With its inception in 1925, Chrysler's logo was a round medallion with a ribbon bearing the name **CHRYSLER** in uppercase block letters.

## Forward Look

Virgil Exner's radical "Forward Look" redesign of Chrysler Corporation's vehicles for the 1956 model year was underscored by the company's adoption of a logo by the same name. The Forward Look logo consisted of two overlapped boomerang shapes, suggesting space age rocket-propelled motion.



## Pentastar

In September 1962, the company adopted a logo named **Pentastar**, made of five triangles arranged so their bases formed the sides of a pentagon. The Pentastar was extensively used on dealer signage, advertisements, and promotional brochures.[15] Contrary to popular belief, the logo was not intended to symbolize the five automotive brands at the time: Plymouth, Dodge, Chrysler, Imperial and Dodge Truck. By 1963 there were only two auto divisions in the United States: Chrysler-Plymouth and Dodge, and there were over a dozen other divisions in the Chrysler Corporation family. The Pentastar was commissioned and designed as a logo usable by all divisions, and which was not tied to any particular automotive styling feature (as had been the case with Forward Look).

Chrysler President Lynn Townsend was looking for a symbol that could be used by all divisions on packaging, stationery, signage and advertising. He wanted something that would be universally recognizable as "Chrysler" to anyone who saw it, in any culture. The Pentastar was simple and easily

recognizable, even on revolving signs. The symbol also facilitated Chrysler's expansion in the international market by removing any text that is commonly used in logotypes.

Divisional logos such as Dodge's Fratzog were gradually phased out until by 1981, all Chrysler divisions used only the Pentastar. All car brands (Valiant, Plymouth, Dodge, Chrysler, Imperial, Hillman, Humber, Sunbeam, Singer, Simca), truck brands (Fargo, DeSoto, Dodge, Commer, Karrier), and all the other Chrysler divisions (air conditioning systems, heating, industrial engines, marine engines, outboard motors, boats, transmissions, four-wheel drive systems, powdered metal products, adhesives, chemical products, plastics, electronics, tanks, missiles) and services (leasing, finance and Mopar) were identified by the Pentastar.



Chrysler Headquarters at Auburn Hills

The Pentastar appeared consistently but inconspicuously on the lower passenger-side fender of all Chrysler products, including foreign brands, from 1963 into the 1972 model year. It was placed on the passenger-side fender so it could be viewed by passers-by, a subtle method of getting the symbol ingrained in the public's mind. A nameplate has to be read, but a symbol is recognizable even to the illiterate. Thus North American and European-market cars had the Pentastar on the right fender, while British and Australian-market cars had it on the left. The practice was revived in 1993. The Chrysler brand used a gem-like version of the Pentastar to identify its more upscale status, and its Imperial models employed a combination of the Pentastar and winged icon.

Chrysler began phasing out the Pentastar as vehicle badging in 1993, when the Dodge division adopted the ram logo beginning with the Dodge Intrepid. The Chrysler brand revived the original gold logo in 1994, eventually adopting the winged logo it had used until the 1950s, in 1998. The winged logo appeared on all cars by 1999, however the 2000 Chrysler Voyager used the plain one. In 1996, Plymouth debuted a new sailboat logo, which was a simplified version of the brand's pre-Pentastar ship logo. The Pentastar's last badging appearance was on the steering wheel, front fender side rub trim, and keys of the Chrysler NS minivans produced from 1996 through 2000 as well as on certain vehicles (although the word CHRYSLER appeared on the steering wheel on some vehicles). The Pentastar continued to represent Chrysler until the merge with Daimler in 1998, when it was retired.

Among the few remaining traces of this motif, is a large, star-shaped window at DaimlerChrysler's American headquarters in Auburn Hills, Michigan, and **Pentastar Aviation**, a former DaimlerChrysler subsidiary which reverted to its original name after being purchased, by a member of the Ford family. Many dealerships still have signage and other traces still visually apparent to the Pentastar, where a five-Pentastar logo remains in use as the logo of the "Five Star Dealer" service rank.[16]

The Pentastar still makes a few relatively inconspicuous appearances on Chrysler Group cars and trucks in markings on window glass and on individual components and molded-plastic assemblies. As the Mopar parts division has also now changed its logo (using a stylized 'M'), the Pentastar is a fading relic of the pre DaimlerChrysler years.

On May 17, 2007, an internal email stated that Chrysler was going to revive the Pentastar logo, in updated form, after their split from Daimler.[17] The new three-dimensional Pentastar was formally introduced when Chrysler LLC began doing business as a private company in August 2007.[18]

## Winged logo

The design shown here is an adaptation of the original medallion logo
which Chrysler used on its cars at its inception in 1925. The logo was
revived for the Chrysler division in 1994, and was surrounded by a pair of
silver wings after the Daimler-Benz merger in 1998. When sold to
Cerberus, Chrysler readopted the Pentastar (see above) as their corporate
logo, although the winged logo is still used on the cars themselves.



Chrysler "winged" logo, used
on Chrysler division cars
1998-present

# Alternative propulsion

For many years, Chrysler developed gas turbine engines for automotive use. Turbines were common in
many military vehicles, and Chrysler built many prototypes for passenger cars. In the 1960s, mass
production seemed almost ready. Fifty Chrysler Turbine Cars, specialty designed Ghia-bodied coupes were
built in 1962 and placed in the hands of regular people for final testing. The turbine engines never saw
production.

## Hybrid vehicles

Chrysler is currently planning at least two hybrid vehicles, the Chrysler Aspen hybrid and Dodge Durango
hybrid, both including HEMI engines. Chrysler plans to use hybrid technology developed jointly with
General Motors Corp. and BMW AG in vehicles beyond the two hybrid SUVs it had already announced
that it would introduce next year.[19] Chrysler has also been experimenting with a Hybrid Diesel truck for
Military applications.

Established in September, 2007, Chrysler's new ENVI division will specifically deal with new hybrid
vehicles not based on existing vehicles and will be led by Lou Rhodes.

# See also

- Chrysler (division) - The Chrysler division of Chrysler
- List of automobile manufacturers
- American Motors Corporation - Chrysler is the inheritor all AMC legacy nameplates, including
  Rambler, Hudson, Nash, Jeep, and Eagle
- Chrysler Building
- ENVI
- Hemi engine
- Lee Iacocca

## Countries

- Chrysler Australia
- Mitsubishi Motors Australia
- Chrysler Fevre Argentina

# References

Case 3:07-cv-03258-SC     Document 22-2     Filed 11/09/2007     Page 13 of 30

1. ^ [1] (http://www.iht.com/articles/1998/05/08/daimler.t_1.php) Schmid, John. "Daimler-Benz Takes Over Chrysler as VW Acquires Rolls-Royce: Fast Lane for German Firms" International Herald Tribune, May 8, 1998. Accessed April 25, 2007.
2. ^ "Cerberus Takes Majority Interest in Chrysler Group and Related Financial Services Business for EUR 5.5 Billion ($7.4 billion) from DaimlerChrysler (http://www.daimlerchrysler.com/dccom/0-5-7145-1-858191-1-0-0-0-0-0-11979-0-0-0-0-0-0-0-0.html) ." Official DaimlerChrysler press release. May 14, 2007.
3. ^ Cerberus gains control of Chrysler, San Jose Mercury News, DEE-ANN DURBIN, AP Auto Writer, 08/03/2007 (http://www.mercurynews.com/arts/ci_6534916)
4. ^ [2] (http://www.chryslerclub.org/walterp.html) Petersen, Mike. "A Brief Look at Walter P. Chrysler", WPC News, November, 1986. Accessed April 25, 2007.
5. ^ Club, Imperial. Airtemp: Chrysler's Airy Solution to the Long, Hot Summer (http://www.imperialclub.com/Repair/Air/airtemp.htm) . Retrieved on 2007-09-16.
6. ^ "Chrysler Unit Sold", *The New York Times*, The New York Times Company, 1982-03-17. Retrieved on 2007-01-18.
7. ^ Article Writer - DaimlerChrysler: Merger or Acquisition? (http://www.thearticlewriter.com/daimler-chrysler-merger-or-acquisition.htm)
8. ^ 'Only part of Chrysler to be sold' (http://www.afp.com/english/news/stories/070414161241.bcw9fjxn.html) , AFP, 14 April 2007
9. ^ Associated Press: Cerberus to Pay $7.4B for Chrysler Stake (http://biz.yahoo.com/ap/070514/chrysler_cerberus.html?.v=31)
10. ^ 'Once Tainted, Nardelli Now Has Chrysler's Keys' (http://www.nytimes.com/2007/08/07/business/07auto.html?_r=1&ref=business&oref=slogin) , AFP, 07 Aug 2007
11. ^ 'BrandWeek.Com - Deborah Wahl Meyer Exits Lexus for Chrysler' (http://www.brandweek.com/bw/news/recent_display.jsp?vnu_content_id=1003626394) , 15 Aug 2007
12. ^ 'Toyota's Top U.S. Executive Is Joining Chrysler' (http://www.nytimes.com/2007/09/07/business/07chrysler.html?_r=1&oref=slogin)
13. ^ Washington Post: Chrysler Lures Another Top Executive (http://www.washingtonpost.com/wp-dyn/content/article/2007/09/07/AR2007090702432.html)
14. ^ [3] (http://www.detnews.com/apps/pbcs.dll/article?AID=/20071011/AUTO01/710110390/1148/AUTO01)
15. ^ [4] (http://blog.chryslerllc.com/blog.do?id=62&p=entry) Stanley, Robert. "Birth of the Pentastar" August 7, 2007. Accessed August 7, 2007.
16. ^ FiveStar.com - Dealership ranking system (http://www.fivestar.com)
17. ^ [5] (http://www.motorauthority.com/cars/chrysler/chrysler%E2%80%99s-old-logo-making-a-comeback/)
18. ^ [6] (http://www.freep.com/apps/pbcs.dll/article?AID=/20070806/BUSINESS01/70806034/1001/NEWS)
19. ^ http://www.planetark.com/dailynewsstory.cfm/newsid/42750/story.htm

- "Why Chrysler Changed Its Corporate Identity". *Ward's Quarterly*, Powers & Company, Inc. Detroit, Michigan, Winter, 1965.
- Chrysler's foray into the Japanese market — its challenges and successes — is documented in Terry Sanders' film *The Japan Project: Made in America*.
- Keegan, Matthew C (2005, October 31). DaimlerChrysler: Merger or Acquisition?. Retrieved August 17, 2007, from The Article Writer Web site: http://www.thearticlewriter.com/daimler-chrysler-merger-or-acquisition.htm
- Kimes, Beverly Rae (Historian and Author) and Clark, Henry Austin, Jr. (Chief of Research) (MCMLXXXIX). *Standard Catalog of American Cars, 1805-1942* (Second edition). Krause Publications, Inc. ISBN 0-87341-111-0.

# External links

- Chrysler LLC corporate website (http://www.chryslerllc.com)
- Soule Chrysler & Imperial Collection plus Chrysler Events Info. (http://home.highertech.net/~soule/)
- Chrysler Official UK brand site (http://www.chrysler.co.uk/)
- Chrysler High Resolution Wallpapers & Pictures (http://www.auto-talk.net/pictures/showgallery.php/cat/526)

## In the media

- Jan 10, 2007, BBC: Chrysler questions climate change (http://news.bbc.co.uk/1/hi/business/6247371.stm)
- Chrysler Commits to New Hybrids, Better Mileage (http://www.planetark.com/dailynewsstory.cfm/newsid/42750/story.htm) .
- August 9, 2007 Detroit Free Press: Chrysler swipes Toyota president (http://www.freep.com/apps/pbcs.dll/article?AID=/20070906/BUSINESS01/70906023/0/COL20)

Retrieved from "http://en.wikipedia.org/wiki/Chrysler"

Categories: All articles with unsourced statements | Articles with unsourced statements since September 2007 | Articles with unsourced statements since October 2007 | Companies established in 1925 | Motor vehicle manufacturers of the United States | Chrysler | Motor vehicle manufacturers based in Michigan

---

- This page was last modified 15:19, 8 November 2007.
- All text is available under the terms of the GNU Free Documentation License. (See **Copyrights** for details.)
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a U.S. registered 501(c)(3) tax-deductible nonprofit charity.

**EXHIBIT** 4



*DaimlerChrysler*
**AUTOMOBILITY**
PROGRAM

# APPLICATION FORM

(See reverse side for program guidelines, eligibility and required documentation.)

**Required documents for reimbursement approval:**

✔ Completed application form
✔ Copy of vehicle registration
✔ Copy of itemized <u>paid</u> invoice from adaptive equipment company

✔ Copy of Buyer's Order or Lease Agreement
✔ Original prescription/letter from a licensed medical doctor when required (see item #3 on back for details)

## VEHICLE OWNER INFORMATION

(Please Print or Type)

Vehicle ID Number

Please follow the claim instructions carefully and be sure that all sections of this form are completed before mailing to Automobility Program Headquarters.

Name

Address

City                     State          ZIP              -

Daytime Telephone Number         -          -

## DEALERSHIP VALIDATION

(Must be completed by an authorized DaimlerChrysler Motors Company, LLC dealership.)

Dealership Name

Business Center     Dealer Code

Telephone Number        -        -          Retail Delivery Date        /        /
Month       Day       Year

## ADAPTIVE EQUIPMENT COMPANY

Company Name

Address

City                     State          ZIP              -

Telephone Number        -        -

Total cost of adaptive equipment and installation: $ _____

Description of adaptive equipment installed: _____

## LICENSED MEDICAL DOCTOR VALIDATION

(Must be completed for running boards, alerting devices and similar-type adaptations. See item #2 on back for details.)

Doctor's Name

First                M.I.              Last

Valid State Medical License Number/DEA Number

State          License Number

Payment issued to: ☐ Customer    ☐ DaimlerChrysler Motors Dealer    Customer Initials _____

I verify that the above information is accurate and complete, and I have agreed the payment is to be issued as above.

| Customer Signature X | Date X |
|---|---|

I verify that the above vehicle has had the adaptive equipment installed as described on the attached receipt(s).

| Dealer Authorized Signature X | Printed Name X | Title X | Date X |
|---|---|---|---|

Note: A copy of the paid receipt(s) detailing the adaptive equipment and costs must be attached to this application form.

WHITE – AUTOMOBILITY PROGRAM HEADQUARTERS         YELLOW – SELLING DEALERSHIP         BLUE – CUSTOMER

# AUTOMOBILITY PROGRAM GUIDELINES

This form must be used to submit a claim for reimbursement under the terms and conditions of the DaimlerChrysler Motors Company, LLC Automobility Program. Through this program, DaimlerChrysler Motors Company, LLC will provide a reimbursement to each eligible customer who installs qualifying adaptive driver or passenger equipment on a purchased or leased new Chrysler, Jeep, or Dodge vehicle (unless discontinued or excluded earlier at the discretion of DaimlerChrysler Motors Company, LLC). Consult your dealer or call Automobility Program Headquarters for eligibility requirements and program expiration dates.

1. Vehicles sold or leased and delivered to a customer by a participating franchised DaimlerChrysler Motors Company, LLC dealer are eligible for payment under this program. Certain types of fleet sales and leases may also qualify. See dealer for details. Sales and installation of adaptive equipment on new DaimlerChrysler vehicles by mobility equipment dealers may also qualify for reimbursement. Contact Automobility Program Headquarters for further information.

2. The adaptive equipment must be installed within six months of vehicle purchase or lease. An application form must be submitted to Automobility Program Headquarters within 60 days of complete installation of adaptive equipment. Note that for certain adaptations, such as wheelchair-capable vehicles, scooter hoists or hand controls, the requirements for a medical note or prescription will be waived. Running boards, alerting devices and similar-type adaptations must have medical documentation. Automobility Program Headquarters can answer questions about other adaptations.

3. Adaptive equipment is defined as equipment that is portable (hand controls or ramps) or permanent that is required by persons with a permanent disability to drive, enter, exit and/or be transported safely in a DaimlerChrysler motor vehicle. Factory-optional equipment is not reimbursable under this program. A prescription or note from a licensed medical doctor on physician's letterhead stating the specific diagnosis is required for reimbursement, excluding exceptions listed above.

4. Conversions to Dodge Caravan, Dodge Grand Caravan, and Chrysler Town & Country models may be reimbursed up to a maximum of $1,000. Conversions to all other eligible Chrysler, Jeep and Dodge models qualify for reimbursement up to a maximum of $750.

5. Wheelchair lifts eligible on Dodge and Freightliner Sprinter models qualify for reimbursement up to a maximum of $500. Running boards qualify for reimbursement up to $400 out of the maximum reimbursement available. Alerting devices qualify for reimbursement up to $200 out of the maximum reimbursement available.

6. This application form must be completed in its entirety and signed by the customer and the selling dealership.

7. DaimlerChrysler Motors Company, LLC will be the final judge as to the eligibility, interpretation and fulfillment of all elements of DaimlerChrysler Motors Company, LLC consumer incentive programs. Any payment or benefits received are subject to the Official Program Rules, which have been made available to all participating dealers.

8. Small-business owners and fleet accounts must provide a business license or legal documentation indicating that they provide services to the physically challenged in lieu of the prescription.

9. A copy of this application form, a copy of the adaptive equipment company's itemized paid invoice, copy of Buyer's Order/Lease Agreement, the vehicle registration, and a prescription or note from a licensed medical doctor on physician's letterhead stating the specific diagnosis (when required) must be mailed to the following address:

**Automobility Program Headquarters**
**P.O. Box 5080**
**Troy, MI 48007-5080**

Payment to the individual Automobility Program customer will be mailed within six weeks after receipt of an **approved** application form and all required documentation. Payments to participating DaimlerChrysler dealers will be made electronically to their dealership's parts account barring special circumstances after receipt of an approved application form and all required documentation.

**Please call**
**Automobility Program Headquarters**
**with any questions:**

**(800) 255-9877**
**Weekdays 9 a.m. – 5 p.m. eastern time**

**www.dc-automobility.com**

**EXHIBIT** 5

STATE OF MAINE
HANCOCK, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-2003-17
                AP-2003-18
                AP-2003-19
                AP-2003-20

*A MH-HAN- 5/ 3 2006*

DARLING'S,                                  )
d/b/a DARLING'S AUTO MALL                    )
                                            )
                                            )
                  Plaintiff/Appellee        )
                                            )
                                            )                 DECISION AND
v.                                          )                 ORDER
                                            )
DAIMLER CHRYSLER MOTORS                      )
COMPANY, LLC,                                )
                                            )
                                            )
                  Defendant/Appellant)            JUN 30 2006

This matter is before the Court on the Defendant's, Daimler Chrysler Motors Company LLC (herein, "Chrysler") appeal pursuant to Rule 76D of the Maine Rules of Civil Procedure from judgment entered by the District Court on September 3, 2003, in favor of the Plaintiff, Darling's. Chrysler contends that Darling's is not entitled to supplemental reimbursement for these four warranty claims because Darling's failed to provide sufficient or reasonable documentation to verify these claims pursuant to 10 M.R.S.A. §1176.[1] A hearing was held on this matter on March 26, 2004.

---

[1] The United States District Court in addressing the long, complex, and litigious history of the enactment of 10 M.R.S.A. §1176 described the following ongoing dispute, which is present here:

> the Manufacturers and Dealers have been engaged for nearly three decades in Maine in an elaborate and contentious game of economic, political, and legal chess. The battle lines in this dispute have been drawn over how much money the Dealers will receive back from the Manufacturers when performing work under manufacturer warranty.
>
> Since the parties themselves have been unable over the course of the last three decades to negotiate satisfactorily their conflicting positions in the warranty reimbursement area, they have each periodically sought to enlist the support of the legislative and judicial arms of government. Each legislative action has been followed by resort to the judicial branch, spawning new legislation and new judicial rulings, a seemingly never ending cycle, perfectly exemplified by the instant case.

Alliance of Automobile Manufacturers v. Gwadosky, docket number 03-154-B-W, *3-4 (D. Me., Feb. 13, 2004) *(J. Woodcock)*.

1

## Background

This appeal concerns a motor vehicle dealer's requests for "supplemental" reimbursement from the manufacturer for warranty repairs pursuant to 14 M.R.S.A. §§7481 et seq. and 10 M.R.S.A. §1176 (warranty reimbursement between motor vehicle franchisor and franchisee). Essentially, the dispute arises from Darling's submissions of claims for warranty reimbursement, which were not fully allowed by Chrysler. Darling's is now seeking to recover the difference between the amount paid by Chrysler and the amount which represented Darling's' alleged customary charges for labor and parts charged on non-warranty work.

Darling's routinely submits claims for warranty reimbursement through Chrysler's computerized system, the Dealer Information Access Link (DIAL), through which Darling's received reimbursement on the four claims at issue. Darling's also submitted an additional claim for "supplemental reimbursement" on these four claims at issue, which Chrysler denied, stating Darling's "intentionally" failed to provide sufficient information to make it practicable for Chrysler to match these claims to Darling's prior submissions through DIAL and to verify that they were properly payable.

Darling's is a franchisee of Chrysler at its Ellsworth location. As such, the provisions of Maine's auto franchise act (10 M.R.S.A. §§1171 et seq.) apply here. However, only §1176 is at issue on this appeal.

As a franchisee, Darling's is required by contract and statute to provide warranty repairs to purchasers of Chrysler's products. The "supplemental reimbursement claims" at issue were requests for warranty parts and labor provided by Darling's to the purchasers of Chrysler products. Darling's practice is to submit its warranty claims to

Chrysler through DIAL. The data that a dealer may input into the DIAL system is limited by fixed variables, which a dealer is unable to adjust. The DIAL system contains a fixed variable for labor reimbursement requests. The DIAL system applies Chrysler's own flat rate time manual. Darling's uses a different flat-rate manual, the Motor Times Manual, to determine the cost of labor.

The Motor Time Manual uses different time allowances for various repairs than the Chrysler time manual. Darling's' Motor Time Manual only fixes the time allowance, *not* the hourly rate. The DIAL system does not recognize the Motor Manual time allowances. Therefore, after putting its preliminary submissions into the DIAL system, Darling's submitted a supplemental claim to recover the difference between the amount paid by Chrysler (determined by the Chrysler time manual) and the amount which represented Darling's customary charges for labor (determined by the Motor Manual) and parts charged on its non-warranty work.

These four claims were tried together before the District Court on June 18, 2003. On July 18, 2003, both parties submitted post-trial briefs. On August 4, 2003, the District Court issued a Memorandum of Decision, but reserved judgment and invited Darling's to supplement the record regarding its practice of adding 8% to its labor charges to Chrysler. Darling's' counsel submitted a letter explaining the 8% charge.[2] Chrysler objected to the Court's consideration of this letter, arguing it was an "untimely, non-evidentiary, post-trial supplementation of the record." The District Court issued a memorandum stating it was satisfied with Darling's explanation, and on September 3, 2003, the Court entered Judgment in Darling's favor on all four claims.

---

[2] The letter stated the 8% charge is a miscellaneous material fee that is added to the customer's bill as an 8% labor charge (capped at $40.00) to cover disposal of hazardous materials.

Chrysler argues that the District Court erred as a matter of law by: (1) not requiring Darling's to provide 100 sequential repair orders from non-warranty repairs to verify that it charges its non-warranty customers the same rates that it charges Chrysler; (2) not requiring Darling's to provide the vehicle identification number (VIN) for each vehicle repaired so that Chrysler can match the supplemental requests to Darling's' DIAL submissions; (3) permitting Darling's to use the Motor Times Manual to calculate labor charges; and (4) permitting Darling's to explain the 8% charge after the close of evidence.

## Discussion

### A.  Standard of Review

Pursuant to Rule 76D of the Maine Rules of Civil Procedure Chrysler may appeal only on questions of law.  Furthermore, "[a]ny findings of fact of the District Court shall not be set aside unless clearly erroneous."  M.R.Civ.P.  76D.  Thus, unless the District Court[3] committed an error of law in concluding that the rate of reimbursement claimed by Darling's was appropriate, the Motor Manual used by Darling's to determine the labor rate is legally permissible, that Darling's charged the same rates for warranty and non-warranty work, and that Darling's complied with the verification required by 10 M.R.S.A. §1176, then the judgment must be affirmed.  *See e.g.* Buffington v. Arnheiter, 576 A.2d 751, 752 (Me. 1990) (holding that an appeal by a party from a District Court judgment to the Superior Court is restricted to questions of law).

---

[3] *See* Darling's Auto Mall v. Daimler Chrysler Motors, docket numbers 02-SC-193, 02-SC-194, 02-SC-213, and 02-SC-214 (Me. Dist. Ct., September 3, 2003) *(J. Staples)*.

4

## B. Maine Statutory Law

### 1. "Particularized Claim" Requirement[4] of 10 M.R.S.A. §1176

The State of Maine regulates warranty reimbursement levels by statute. *See* 10 M.R.S.A. §1176.[5] Chrysler contends that Darling's failed to provide sufficient or reasonable documentation to verify its supplemental claims as required by §1176; therefore, Darling's is not entitled to supplemental reimbursement. Specifically, Chrysler argues that Darling's needed to submit the vehicle identification number (VIN) for each vehicle repaired in its supplemental reimbursement claim and that Darling's needed to submit 100 non-warranty customer paid service repair orders to meet the reasonable verification requirement of §1176.

---

[4] The term "particularized claim" does not appear in §1176, but it is a term often used to describe the requirements of §1176.

[5] 10 M.R.S.A. §1176, entitled "Warranty" provides in pertinent part as follows:

> If a motor vehicle franchisor requires or permits a motor vehicle franchisee to perform labor or provide parts in satisfaction of a warranty created by the franchisor, the franchisor shall properly and promptly fulfill its warranty obligations, in the case of motor vehicles over 10,000 pounds gross vehicle weight rating, shall adequately and fairly compensate the franchisee for any parts so provided, and in the case of all other motor vehicles, shall reimburse the franchisee for any parts so provided at the retail rate customarily charged by that franchisee for the same parts when not provided in satisfaction of a warranty. Further, the franchisor shall reimburse the franchisee for any labor so performed at the retail rate customarily charged by that franchisee for the same labor when not performed in satisfaction of a warranty; provided that the franchisee's rate for labor not performed in satisfaction of a warranty is routinely posted in a place conspicuous to its service customer.

> Any claim made by a franchisee for compensation for parts provided or for reimbursement for labor performed in satisfaction of a warranty must be paid within 30 days of their receipt. When any such claim is disapproved, the franchisee that submitted it must be notified in writing of its disapproval within that period, together with the specific reasons for its disapproval. No franchisor may, by agreement, by restriction upon reimbursement, or otherwise, restrict the nature or extent of labor performed or parts provided so that such restriction impairs the franchisee's ability to satisfy a warranty created by the franchisor by performing labor in a professional manner or by providing parts required in accordance with generally accepted standards.

The Court notes that §1176 was amended in the last Legislative session. The version applicable at the time of the small claims hearing is stated above.

The Law Court has established that manufacturers are entitled to institute reasonable procedural requirements relating to warranty reimbursement, and the absence of an affirmative statutory command that a dealer adhere to a particular procedural requirement does not necessarily bar manufacturers from imposing such a requirement. *See e.g.* Acadia Motors, Inc. v. Ford Motor Co., 2002 ME 102, ¶11, 799 A.2d 1228 (holding that Ford was entitled to institute a surcharge to recover the higher costs of doing business in Maine caused by §1176's requirement of retail reimbursement). In Darlings v. Ford Motor Co., the Law Court concluded that Ford was within its right in imposing reasonable verification requirements and in imposing a reasonable time limit on the submission of warranty claims, although neither requirement appeared in the statute. 1998 ME 132, ¶6; 719 A.2d 111 (stating that accomplishing the objectives of §1176 necessarily requires that a dealer submit a claim that is sufficiently individualized to enable a manufacturer to satisfy its statutory obligations).

The Law Court has shed little light on the substance of a claim submitted by a dealer that is sufficiently individualized to enable a manufacturer to satisfy its obligations under §1176. In Acadia Motors, Inc. v. Ford Motor Co., the Law Court only tells us that a dealer's claim for reimbursement under §1176 simply for "all warranty parts" is insufficient. 844 F. Supp. 819, 825 (D. Me. 1994), *aff'd in part, rev'd in part on other grounds,* 44 F.3d 1050 1st Cir. 1995). On the other hand, a dealer's claim for reimbursement under §1176, which specified the dealer's original computerized claim number, the retail amount claimed, the amount the dealer received under the nationalized system, the nature of the claim (parts or labor), and the difference between the amount

6

received and the retail price was held to be sufficient for the manufacturer to satisfy its statutory obligations. Darling's v. Ford Motor Co., 1998 ME 232, ¶7, 719 A.2d 111.

The Law Court has made it clear that manufacturers, such as Chrysler may impose reasonable procedural requirements relating to reimbursement. The Court finds that the District Court correctly concluded that Darling's supplemental claims were sufficiently individualized to enable Chrysler to satisfy its statutory obligations under §1176. The Law Court approved the same information submitted by the dealer in Darling's d/b/a Darling's Bangor Ford v. Ford Motor Co., 1998 ME 232, ¶7, 719 A.2d 111.

Chrysler further argues that it is entitled to require Darling's to submit 100 non-warranty customer-paid service repair orders to verify that Darling's charges its non-warranty customers the same rates as it charges Chrysler. As support for its argument that this request was reasonable, Chrysler relies on the Law Court's decision in Darling's v. Ford Motor Co., 1998 ME 232, 719 A.2d 111[6] and points to the Legislature's most recent amendment to §1176.[7] The Court finds that Chrysler's argument must fail because at the time it denied Darling's supplemental claims for reimbursement, §1176 was silent as to suggested methods for a manufacturer to verify that the dealer charges the same

---

[6] In Darling's v. Ford Motor Co., the Law Court held that §1176 does not prohibit a manufacturer from imposing reasonable verification requirements on dealers, such as a time limit on submitting claims for reimbursement; however, the opinion is silent on the issue of requiring a dealer to submit non-warranty customer-paid repair orders. 1998 ME 232, ¶18-19, 719 A.2d 111.

[7] 10 M.R.S.A. §1176 (2003) now contains the following amendment:

For purposes of this section, the retail rate customarily charged by the franchisee for parts may be established by submitting to the franchisor 100 sequential nonwarranty customer-paid service repair orders or 60 days of nonwarranty customer-paid repair service orders, whichever is less in terms of total cost, covering repairs made no more then 180 days before the submission and declaring the average percentage markup.

7

rates to both warranty and non-warranty customers. Moreover, this verification procedure is not required as a result of the Law Court's ruling.

Furthermore, although not statutorily required to do so, Darling's did send Chrysler a large number of receipts of retail sales to non-warranty customers to show Chrysler that Darling's' charges for parts were "provided at the retail rate customarily charged by the franchisee for the same parts when not provided in satisfaction of a warranty." 10 M.R.S.A. §1176. Moreover, Chrysler accepted the same verification when it paid the amount agreeable to it on the claims initially submitted through the DIAL system. Accordingly, the District Court did not err in concluding that §1176 did not require Darling's to provide the verification requested by Chrysler.

### 2. Labor Retail Rate

The statute requires manufacturers to reimburse dealers for labor provided in the course of warranty work "at the retail rate customarily charged by that franchisee for the same labor when not performed in satisfaction of a warranty; provided that the franchisee's rate for labor . . . is routinely posted in a place of conspicuous to its service customer." 10 M.R.S.A. §1176. Chrysler argues that the District Court erred in concluding that Darling's was entitled to use of the "Motor Times Manual" to calculate its "inflated" labor charges to Chrysler. Chrysler further argues that Darling's does not post all of its "inflated" labor rate information in the service department as required by statute. See Appellant's Brief, p 18.

The United States District Court determined that use of a flat rate manual, such as Darling's Motor Times Manual comports with the legislative intent in enacting 10 M.R.S.A. §1176 and related statutes. Darling's v. Ford Motor Company, docket number

95-398-B-H, *14-18 (U.S. Dist. Ct., Me. 1998) (*J. Hornby*) (attached as Appellant's Exhibit E). "Flat Rate Pricing,"[8] which results from the use of either Darling's' Motor Times Manual or Chrysler's own Time Manual is not prohibited. *See* Darling's v. Ford Motor Company, 1998 ME 232, ¶8, n. 5, 719 A.2d 111 (approving use of a nationally recognized manual by a dealer even tough it exceeded the manufacturer's flat rate, as long as dealers comply with the statutory posting requirements).

Dealers are required by statute to notify their customers of their labor pricing practices. *See* 29-A M.R.S.A. §1805.[9] Specifically, §1805 requires dealers not only to

---

[8] "Flat Rate Pricing," as used here, refers to when a dealer consults sources for the number of hours to assign and then multiples that number by its hourly rate regardless of the amount of time actually spent and regardless of the amount of time the manufacturer thinks is appropriate. Darling's v. Ford Motor Company, 1998 ME 232, ¶8, n.5, 719 A.2d 111; *see also* 29-A M.R.S.A. §1801(2).

[9] 29-A M.R.S.A. §1805 (1996 & Supp. 1997) provides:

1. Form of notice. A repair facility must post the following notice in a place where it is reasonably likely to be seen by customers. The notice must be completed with information on charges and printed so that it is conspicuous and can be read by the average person.

 The following form must be used:
 "NOTICE TO OUR CUSTOMERS IS REQUIRED UNDER STATE LAW"
 Before we begin making repairs, you have a right to put in writing the total amount you agree to pay for repairs. You will not have to pay anything over that amount unless you agree to it when we contact you later.

 Before you pay your bill, you have a right to inspect any replaced parts. You have a right to take with you any replaced parts, unless we are required to return the parts to our distributor or manufacturer.

 We can not install any used or rebuilt parts unless you specifically agree in advance.

 You cannot be charged any fee for exercising these rights.

 WE CHARGE $ PER HOUR FOR LABOR. (We round off the time to the nearest.)

2. Flat Rate. The notice must also contain the following if it applies:
 "We also charge a flat rate for some repairs. Our service manager will explain what a flat rate is and show you how much it may cost you. A flat-rate charge may not match the time actually spent repairing your vehicle. PLEASE ASK US WHETHER WE WILL CHARGE YOU BY THE HOUR OR AT A FLAT RATE."

3. Availability of guide. The notice must also contain the following:
 "The current edition of the National Automobile Dealer's Association Official Used Car Guide New England Edition is available for your review upon request."

9

post their hourly charges for labor, but also to notify consumers about "flat rate" pricing. §1805(2) directs dealers to notify consumers when flat rate pricing is used and to indicate that information about flat rate pricing is available upon request. Darling's may use flat rate pricing by way of the Motor Times Manual, as long as it complies with the notification requirements of §1805.

The Court finds that Darling's use of the Motor Times Manual, which is nationally recognized, to determine its time allowances for various repairs to calculate its retail labor charges to Chrysler is legally permissible. If Darling's is charging non-warranty customers too much by using the Motor Times Manual, as Chrysler contends, then market forces will make the appropriate correction. 10 M.R.S.A. §1176 only requires that warranty and non-warranty customers be charged the same retail labor rate. The District Court did not commit clear error in concluding that Darling's charged the same rates for warranty and non-warranty work. The record shows that Darling's posted its labor rate information in the service department as required by 10 M.R.S.A. §1176 and 29-A M.R.S.A. §1805(1).[10]

---

[10] See Appellee's Brief, p. 2, 5-6 (citing to the trial record to show that the actual hourly rate charged by Darling's to both warranty and non-warranty customers is posted in its service department in accordance with Maine Law). It is Chrysler's contention that Darling's did not comply with the statutory posting requirements; therefore, it argues Darling's is not entitled to reimbursement on its supplemental claims for warranty work. Specifically, Chrysler argues that the Motor Times Manual does not include a charge for all repairs and that in those instances Darling's falls back on Chrysler's time manual and inflates the charges by 33-50%. Chrysler contends that in these instances Darling's must provide its own time manual to the consumer and explain that it inflates its charges. Chrysler contends that based on these facts Darling's did not comply with the statutory posting requirements.

The Court finds that Chrysler's argument must fail. 10 M.R.S.A. §1176 only requires dealers to notify their consumers about their labor pricing practices. 29-A M.R.S.A. §1805(1) requires dealers to post a notice that specifies the hourly charge. §1805(2) only directs dealers to notify consumers when flat rate pricing is used and to indicate that such information is available to consumers upon request. The parties do not dispute that Darling's posted notice of its labor pricing practices in accordance with §1805, rather Chrysler disputes Darling's reliance on the Motor Times Manual. §1805(2) does not require Darling's to provide its customers with Chrysler's own time manual as Chrysler contends. The Court finds that Darling's has complied with the statutory posting requirements.

### 3. 8% Miscellaneous Materials Fee

Chrysler argues that the District Court erred as a matter of law by allowing Darling's to supplement the record after the close of evidence to explain its practice of adding an 8% miscellaneous materials fee to its labor charges in its claims for supplemental reimbursement. Once the District Court received Darling's explanation, the Court concluded that Darling's had complied with §1176.

Maine Rule of Small Claims Procedure 6(b) governs the rules of evidence at a small claims hearing in District Court and states the following procedure:

> (b) Evidence. The rules of evidence, other than those with respect to privileges, shall not apply. The court may receive any oral or documentary evidence, not privileged, but may exclude any irrelevant, immaterial, or unduly repetitious evidence. The court shall assist in developing all relevant facts. The hearing shall be conducted in a manner designed to provide the parties with full opportunity to present their claims and defenses.

The District Court's post-hearing inquiry to clear up the ambiguity of the 8% miscellaneous materials fee on Darling's labor charges in its supplemental claims for reimbursement is consistent with the informality of small claims practice where the rules of evidence (other than privileges) do not apply. The District Court did not commit an error of law in allowing Darling's to submit a post-hearing explanation[11] of this 8% fee.

---

[11] Mr. Darling submitted the following explanation to the District Court:

> The miscellaneous materials fee is an additional 8% labor charge (capped at $40.00) that we add to the customer's bill to cover disposal of hazardous materials (oil, dirty rags, contaminated gasoline, etc.), cleaning solvents, adhesives, fasteners, etc."

*See* Appellant's Brief, Exhibit B.

11

## Conclusion

The District Court correctly concluded that the rate of reimbursement claimed by Darling's was appropriate, the Motor Times Manual used by Darling's to determine the labor rate is legally permissible, that Darling's charged the same rates for warranty and non-warranty work, and that Darling's complied with the verification required by 10 M.R.S.A. §1176.

Accordingly, the entry is:

Appeal **DENIED**. Decision of the Ellsworth District Court **AFFIRMED**.

The Clerk may incorporate this Decision and Order into the docket by reference.

DATED: May 10, 2004

_____
Justice, Maine Superior Court

FILED &
ENTERED

MAY 1 0 2004

**SUPERIOR COURT
HANCOCK COUNTY**

12